STATE of Missouri, Respondent,

v.

Bobby Lee MACE, Appellant.

No. WD 34586.

Missouri Court of Appeals,
Western District.

Jan. 24, 1984.

David H. Miller, Richmond, for appellant.

John Ashcroft, Atty. Gen., Carrie Francke, Asst. Atty. Gen., Jefferson City, for respondent.

BEFORE SOMERVILLE, P.J., and NUGENT and LOWENSTEIN, JJ.

SOMERVILLE, Presiding Judge.

Defendant was charged with assault in the second degree, a class D felony, § 565.-

060, RSMo 1978.[1] Assault in the second degree, as statutorily prescribed in § 565.-060, creates a single offense notwithstanding the fact it may be committed by any one of three different methods.

The original information charged that defendant committed the offense by the method delineated in § 565.060.1(1). On the morning of trial, over objection of defendant, the State was permitted to file an amended information charging that defendant committed the offense by the method delineated in § 565.060.1(2).

A jury found defendant guilty of assault in the second degree and assessed his punishment at five years imprisonment. Judgment and sentence were entered and pronounced accordingly.

Defendant, on appeal, levels five charges of error: (1) the trial court erred in permitting the state to file an amended information because the original information failed to charge defendant with a cognizable offense; (2) the trial court erred in permitting the State to file an amended information in that the amended information charged a "distinctively different" offense and was per se prejudicial; (3) the trial court erred in failing to define "physical injury" as used in Instruction No. 7 (submitting assault in the third degree as a lesser included offense) in that said definition was necessary for the jury to properly distinguish between assault in the second degree submitted by Instruction No. 5 (which included the term "serious physical injury" which was separately defined) and assault in the third degree submitted by Instruction No. 7; (4) the evidence was insufficient to support a finding by the jury that defendant struck the victim with his fists as alleged in the amended information; and (5) the evidence was insufficient to support a finding by the jury that the victim suffered "serious physical injury", a requisite element of the offense of assault in the second degree committed by the method charged in the State's amended information. A comprehensive review of the evidence is unavoidable due to the far ranging scope of the points relied on by defendant on appeal.

The date of the alleged assault was April 30, 1982, and the victim was defendant's ex-wife. When the marriage was dissolved, the victim was granted custody of a son born of the marriage, and she retained her married name.

The victim, although single, was due to give birth to a child on May 10, 1982. It stands undisputed that the victim's current boyfriend was the father of the expected child. On one or two previous occasions the victim advised defendant that she intended to use "Mace" as the last name of the expected child.

On April 30, 1982, the victim was living in a two-story private residence which had been converted into two apartments. Her apartment was located on the second floor. The first floor apartment was occupied by a married couple. The wife of the married couple was acquainted with both the victim and the defendant.

According to the victim, defendant came to her apartment around midnight on April 30, 1982. He had been drinking and said he "wanted to talk". The victim admitted him and the two discussed her forthcoming child. During the discussion the victim told defendant, her ex-husband, that she intended to name the baby she was expecting "Mace", as "there's no sense of me naming this one a different name whenever me and Robbie [the son born of her marriage to defendant] was going by Mace." Defendant's reaction was described as follows by the victim: "He says, 'you're not naming that kid—giving that kid my name' … [h]e got mad and threw hisself [sic] down on top of me … [h]e had his arm around my neck and he forced his hand up my gown into me … [t]old me he was going to rip the baby out, that I wasn't going to have that baby … [h]e told me that I was going to pay … I tried to get his hand out and … [h]e kept pushing it up farther and farther … [h]e had a hold of my insides and he was trying to—twist-

---

**1.** All subsequent statutory references are to RSMo 1978 unless otherwise indicated.

ing around, told me that he was going to rip the baby out, that I wasn't going to have that baby and I wasn't going to name it Mace." The victim began screaming and implored defendant to stop hurting her. Defendant then left the victim's apartment in a rage, and as he did so he told the victim he hoped the baby was dead.

The victim called the wife of the married couple who lived in the other apartment and told her what had happened. The latter confirmed the conversation and further testified that on the night in question, after being awakened by the slamming of a door, she observed defendant leaving the victim's apartment.

The assault, according to the victim, bruised her "inside and out" in the vaginal area, caused an internal laceration, made her so "sore" it hurt to "walk" or "sit", and caused increased "water leakage". Regarding the latter, approximately five months prior to the date in question, the victim sustained trauma to her abdominal area in an automobile accident causing "leakage" of the "fluid surrounding the baby ... inside the uterus." The "leakage" just mentioned, however, had sealed off prior to April 30, 1982.

The following day the victim consulted her attending physician. He examined the victim and testified as to the following diagnosis. The victim was "very tender over the paramedial area [the vagina and surrounding tissues]"; she had a "laceration ... to the right side of the urethra, that is the opening to the vagina, and she had abrasions within the vagina itself"; she was in "extreme pain" and there "was fluid definitely leaking from the external wall of the cervix." The "fluid leakage" was a major concern because of the lurking danger of infection which could be fatal to the near term fetus. The attending physician prescribed antibiotics to control infection that might be occasioned by the "water leakage" and "bed rest" was ordered.

Fortunately, the victim gave birth to a healthy baby girl by cesarean section on May 10, 1982. The attending physician testified, on cross-examination, that the victim sustained no "permanent injury" to her vaginal area or "disfiguring injury" of any

kind. The victim, however, was still "doctoring" at the time of trial [November 15, 1982] for the laceration to her urethra which remained unhealed.

It is further noted that defense counsel, on cross-examination, adroitly elicited from the victim that defendant never "struck" her with "his fists". Defendant seizes upon this as irrefutable proof that he never struck the victim with his fists as charged in the amended information. When the testimony just mentioned is placed in proper perspective, it is implicit, and the jury could reasonably infer, that the victim responded in the sense that defendant did not exteriorly strike her with his fists on and about her body generally, but confined his assault to her vaginal area.

Defendant asserted an alibi defense. In support thereof he took the stand and testified that he was not at the victim's apartment on the night in question and categorically denied that he assaulted the victim. Two witnesses, defendant's current girlfriend and a male acquaintance, testified on his behalf that they were with him before, during and after the time of the alleged assault and that he was never at the victim's apartment during the time frame mentioned.

 Defendant's first point, that the trial court erred in permitting the State to amend the information on the morning of trial because the original information failed to charge an offense, affords no basis for relief. The original information specifically charged that defendant, "in violation of *Section 565.060, R.S.Mo., committed the Class D felony* of ASSAULT IN THE SECOND DEGREE ... in that ... defendant *knowingly caused physical injury* to Shelby Mace by striking the said victim with his fists." (emphasis added) Section 565.060, captioned "Assault in the second degree", delineates that the offense may be committed by any one of three methods. Section 565.060.1(1), pertinent at this juncture, reads as follows: "He *knowingly* causes or attempts to cause *physical injury* to another person *by means of a deadly weapon or dangerous instrument....*" (emphasis added) It is patently clear that the

original information charged defendant with committing assault in the second degree by the method immediately heretofore set forth.

Defendant, however, contends that the original information was fatally defective because it failed to allege that the assault was perpetrated by means of "a deadly weapon or dangerous instrument." This contention conveniently ignores § 556.-061(7) and a plethora of cases recognizing the latent violence and force that may be unleashed by the use of one's fists. Section 556.061(7), supra, defines "dangerous instrument" as follows: " 'Dangerous instrument' means any instrument, article or substance, which, under the circumstance in which it is used, is readily capable of causing death *or other serious physical injury*." (emphasis added) Concomitantly, see, for example, *State v. Selle*, 367 S.W.2d 522, 527 (Mo.1963) and *State v. Gardner*, 522 S.W.2d 323, 324 (Mo.App. 1975), holding that "an assault with fists may be a force likely to produce death or great bodily harm." Instead of relying on the generic term "dangerous instrument" in the original information, the State chose to be more specific and charged that defendant perpetrated the assault by use of his "fists".

The general rule for assessing the sufficiency of an information is clearly explicated in *State v. Strickland*, 609 S.W.2d 392, 395 (Mo. banc 1980): "The test of the sufficiency of an indictment [information] is whether it contains all the essential elements of the offense as set out in the statute and clearly apprises defendant of the facts constituting the offense in order to enable him to meet the charge and to bar further prosecution." Superimposition of the aforementioned upon the original information in this case leads to the inevitable conclusion that the original information contained all the essential elements of assault in the second degree and sufficiently apprised defendant of the facts constituting the offense so as to enable him to meet the charge and to bar further prosecution. If defendant entertained genuine doubts as to details of certain essential facts he could

have elicited greater particularity by means of a bill of particulars (Rule 23.04). The record discloses he made no effort to do so.

Defendant's second point, that the trial court erred in permitting the state to file an amended information in that the amended information charged the defendant with a "distinctively different" offense and was per se prejudicial, likewise affords no basis for relief. The amended information, up to a point, paralleled the original information. It charged that defendant, in violation of § 565.060, committed the class D felony of assault in the second degree. At this point the amended information varied from the original information by alleging that the offense was committed in the following manner, to-wit, "in that defendant *recklessly* caused *serious physical injury* to Shelby Mace by striking her with his fists." (emphasis added) Section 565.060.1(2), pertinent at this juncture, reads as follows: "He recklessly causes serious physical injury to another person...." The amended information clearly charged defendant with the same offense, assault in the second degree. The only change effected was the manner or method by which the offense was perpetrated. Rule 23.08 provides that "[a]ny information may be amended ... at any time before verdict ... if no additional or different offense is charged and if a defendant's substantial rights are not thereby prejudiced...."

█ Defendant dually argues that the amended information charged him with a different offense and that he was prejudiced by reason of the fact that evidence which he relied upon as to the nature and extent of the victim's injuries was no longer applicable. *State v. White*, 608 S.W.2d 134 (Mo.App.1980) strips the first prong of defendant's bifurcated argument, that the amended information charged a different offense, of any validity. The original information in *White* charged defendant therein with having committed the offense of forgery by one of four statutorily recognized methods. The State was permitted to file an amended information charging the defendant therein with the same offense, to-wit, forgery, but that it was committed by

a different statutorily recognized method. The court in *White* rejected the argument of the defendant therein that the amended information charged a different offense. In doing so it drew upon a line of cases dealing with former § 560.156.2, RSMo 1969, on stealing, holding that a single offense of stealing was created by statute which could be committed by either of two methods, and that an amended information predicated on an alternate method did not charge a different offense. See *State v. Higgins*, 592 S.W.2d 257 (Mo.App.1979) and *State v. Warfield*, 507 S.W.2d 428 (Mo.App. 1974). The amended information in the instant case did not run afoul of the prohibition of alleging a different offense by amendment. *State v. White*, supra; *State v. Higgins*, supra; and *State v. Warfield*, supra.

■ The second prong of defendant's bifurcated argument, that the amended information prejudicially affected him in that evidence which he relied upon as to the nature and extent of the victim's injuries was no longer applicable, is equally untenable. The test for prejudice when an amended information is filed is found in *State v. Taylor*, 375 S.W.2d 58, 63 (Mo.1964): "The test of prejudice is whether a defense under the charge as originally made would be equally available after the amendment and whether defendant's evidence would be equally applicable after as well as before the amendment." Defendant, quite properly, makes no claim that his defense of alibi was not equally available after the amendment. He focuses solely upon the alleged inapplicability of his evidence re the nature and extent of the victim's injuries as the basis for his claim of prejudice. Parenthetically, he neither claimed surprise nor sought a continuance when leave to amend was granted.

The original information charged defendant with inflicting "physical injury" upon the victim and the amended information charged him with inflicting "serious physical injury" upon the victim. Section 556.-061(19) defines "physical injury" as follows: " 'Physical injury' means physical

pain, illness, or any impairment of physical condition." Section 556.061(24) defines "serious physical injury" as follows: " 'Serious physical injury' means physical injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." It is apparent, by comparison, that the quality of evidence required to prove "serious physical injury" is more demanding than the quality of evidence required to prove "physical injury". Perforce, evidence which would disprove "physical injury" would, ipso facto, disprove "serious physical injury". Any evidence available to defendant regarding the nature and extent of the victim's injuries was equally probative after, as well as before, the amendment.

■ Defendant's third point, that the trial court erred in not defining "physical injury" as used in Instruction No. 7 (submitting assault in the third degree as a lesser included offense), affords no basis for relief. Defendant's argument with respect thereto tracks the following course. Instruction No. 5 submitting assault in the second degree contained the term "serious physical injury", which term was correctly defined in Instruction No. 10. Admittedly, the term "physical injury" as used in Instruction No. 7 was not defined. According to defendant, by defining "serious physical injury" and failing to define "physical injury", the jury could not properly distinguish between assault in the second degree and assault in the third degree. It is appropriate to note that defendant did not request an instruction defining "physical injury". The "Notes on Use" appended to both MAI–CR2d 19.04.2 [submission of assault in the second degree under § 565.-060.1(2) ] and MAI–CR2d 19.06.1 [submission of assault in the third degree under § 565.070.1(1), (2), (3) ] provide that "physical injury" contained therein "may be defined on the court's own motion without a request, and must be defined upon written request in proper form by the state or by the defendant...." Notwithstanding

his failure to request an instruction defining "physical injury", defendant seeks relief under the aegis of § 546.070(4): "Whether requested or not, the court must instruct the jury in writing upon all questions of law arising in the case which are necessary for their information in giving their verdict...." Section 546.070(4) provides no refuge for defendant. When instructions "employ words of 'common usage', no definition or amplification of such terms is required." *State v. Ogle*, 627 S.W.2d 73, 76 (Mo.App.1981), citing *State v. Hammond*, 571 S.W.2d 114 (Mo. banc 1978) and *State v. Abram*, 537 S.W.2d 408 (Mo. banc 1976). The term "physical injury", whether microscopically or macroscopically viewed, connotes an injury of lesser degree or severity than a "serious physical injury". The term "physical injury" employs words of common usage in comparison with the term "serious physical injury" and it defies credulity to believe that the jury was unable to distinguish between assault in the second degree and assault in the third degree on the highly technical premise that "physical injury" was not defined. The fact that the "Notes on Use" to both MAI–CR2d 19.04.2 and 19.06.1 recognize that defining "physical injury", absent specific request by a defendant, is within the discretion of the trial court, gives impetus and validity to the conclusion that the term has all the overtones of a term of common usage. Contrary to defendant's belief, his third point is no bastion of appellate relief.

■ Defendant's fourth point, that the evidence was insufficient to support a finding by the jury that defendant "struck" the victim with "his fists" as alleged in the amended information, misconstrues the charge ultimately submitted to the jury. The record discloses that the information, as amended immediately prior to trial, was again amended at the close of the State's case by deleting the words "with his fists", and the State's verdict director submitted both assault in the second degree and assault in the third degree in terms of "striking" with all reference to "fists" deleted. The aforementioned was occasioned by the

following events. At the close of the State's case, defendant orally moved for a directed verdict of acquittal on the ground that the victim admitted on cross-examination that he did not strike her with his fists. The State responded by asking that the amended information be further amended to conform to the evidence by deleting the words "with his fists", and the case was ultimately submitted to the jury accordingly. The information, as further amended, neither alleged a different offense nor prejudicially impaired any substantial rights of defendant. Deletion of the words "with his fists" had no bearing on defendant's alibi defense. The efficacy of defendant's alibi defense was the same before and after the amendment in question. Circumstances comparable to those in the case sub judice arose in *State v. Eaton*, 504 S.W.2d 12, 20–21 (Mo.1973). The defendant in *Eaton* relied on an alibi defense. At the close of the case, the State was permitted to amend its information to conform to the evidence which in no way charged a different offense or impaired defendant's alibi defense. The court in *Eaton* refused to posit error on the basis of the State's amendment to conform to the evidence.

■ If properly perceived, the marrow of defendant's fourth point appears to be that "striking" the victim could not have occurred absent the hand being contracted into a "fist", hence the State failed to make a submissible case. There was no confusion in the minds of defendant or his counsel as to the victim's account of what occurred on the night in question. Neither claims that the victim ever varied or changed her version of what occurred. Hence, they attach no claim of surprise to the amendment conforming to the evidence. Simplistically put, the victim consistently maintained that defendant forced his hand into her vagina. The word "striking", as defined in Webster's Third New International Dictionary (1971), means, among other things, "to deliver a stroke, blow or thrust [as with the hand, a weapon or a tool]." The victim's detailed account of what occurred on the night in question,

which the jury obviously believed, afforded a substantial basis for the jury to find beyond a reasonable doubt that defendant injured the victim by "striking" her.

■■■■ Defendant's fifth and final point, that the evidence was insufficient to support a finding by the jury that defendant inflicted "serious physical injury" upon the victim, is devoid of substance. At the risk of being repetitious, "serious physical injury" is defined as follows in § 556.061(24): " 'Serious physical injury' means physical injury that creates a substantial risk of death or that causes serious permanent disfigurement or *protracted* loss or *impairment* of the *function* of any *bodily* member or *organ.*" (emphasis added) Admittedly, incurment of "serious physical injury" by "a substantial risk of death" or "serious permanent disfigurement" to the victim are ruled out by the collective testimony of the victim and her attending physician. Their collective testimony, however, does not rule out incurment of "serious physical injury" by "protracted ... impairment of the function of any bodily ... organ." "Protracted", as defined in Webster's Third New International Dictionary (1971), means "to draw out or lengthen in time or space; continue, prolong." "Impairment" is defined therein as "the act of impairing or the state of being impaired." "Impairing" and "impaired", in turn, are defined therein as "to make worse; diminish in quantity, value, excellence or strength; damage, lessen." The word "function" is defined therein as "the action to which a person or thing is specifically fitted, used or responsible or for which a thing exists." The word "organ" is defined therein, among several principal definitions, as "the bodily parts performing a certain function." "Organ" in § 556.061(24) has a broad scope. "Impairment" of an "organ" as used in § 556.061(24) is not limited to "impairment" of a single isolated organ, but also encompasses "impairment" of the collective "function" of a group of "organs". So construed, "function" of the victim's reproductive system to give live birth to the near term fetus she was carrying dominates defendant's fifth

and final point. Therefore, the term "protracted", temporally speaking, is to be measured in reference to the period ensuing between infliction of the injury to the victim on the night of April 30, 1982, and birth of a healthy baby girl on May 10, 1982. In the frame of reference just mentioned, the victim's attending physician testified that "fluid" was "definitely leaking from the external wall of the [victim's] cervix." This was a major source of concern as the attending physician further testified that the leakage of fluid makes the female reproductive system susceptible to infection, which, in turn, may be fatal to an unborn child. To combat this danger, antibiotics and "bed rest" were prescribed, the success or effectiveness of which could not be ultimately determined until the delivery date. Moreover, the victim could not "sit" or "walk" without pain prior to delivery of the child and the laceration to her urethra had not healed as of the time of trial. When measured against the controlling time frame, the leakage of fluid and its propensity for making the victim's reproductive system susceptible to infection with attendant danger to the unborn child, standing alone, demonstrates that the heinous attack portrayed by the victim's testimony resulted in "protracted ... impairment of the function of [a] bodily ... organ."

This court entertains no qualms in holding that defendant's fifth and final point fails to present any viable basis for appellate relief.

Judgment affirmed.

All concur.